### THE DAUNTLESS.

(Circuit Court of Appeals, Fourth Circuit. November 4, 1909.)

#### No. 865.

COLLISION (§ 153*)—TUG AND SCHOONER MEETING—FAULT.

> The decree of a trial court, based on conflicting evidence, finding that a collision at night in Chesapeake Bay between a tug with tows and a schooner, meeting nearly head on, was due solely to the fault of the tug as the burdened vessel in failing to keep out of the schooner's way, as she might have done by proper navigation, affirmed; it appearing that the vessels saw each other when more than a mile apart and by a preponderance of the testimony that the schooner kept her course.
>
> [Ed. Note.—For other cases, see Collision, Dec. Dig. § 153.*
>
> Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the District of Maryland.

Suit in admiralty by E. D. Gladding and others, as owners of the schooner E. G. Irwin and cargo, against the steam tug Dauntless. Decree for libelants, and claimant appeals. Affirmed.

Arthur D. Foster and Floyd Hughes, for appellant.

Robert H. Smith, for appellees.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

GOFF, Circuit Judge. In Chesapeake Bay, near Point No Point Lighthouse, during the night of December 12, 1907, the steam tug Dauntless was in collision with the two-masted schooner E. G. Irwin. The tug was going up the bay with two barges in tow, the Triton, which was loaded with lumber, and the Baltimore light; the schooner going down with a cargo of coal. The wind was from the northwest, the night being clear. The tug was making about five, and the schooner about seven, miles an hour; the former claiming to be proceeding on a north-northwest course, and the latter south by east. The schooner sank soon after the collision, her cargo being a total loss. The libel was filed by the owners of the vessel, the owner of the cargo, and the crew, to recover for their respective losses.

The testimony is painfully conflicting, impelling the court to consider the probabilities that would naturally ensue from conditions fairly well established. The mate of the schooner, an experienced seaman, was in charge of her navigation, and a capable man was at the wheel. It was the mate's watch, and he was also acting as lookout. He states in his deposition that shortly before the collision he saw the white lights and the red light of the tug on his port bow, about one

mile distant; that the order was given the helmsman to hold his course; that the tug shut in her red and opened her green light, when the collision occurred—the schooner being struck on her port bow, her anchor thrown overboard, her bowsprit twisted, and her stem broken, causing her to leak and sink. The libelant's testimony shows that the course of the schooner was south by east, and that it was not changed; that the mate, after seeing the lights of the tug, examined the lights on the schooner, finding them in good order; that the tug when about 50 yards distant showed her green light, thereby indicating that she had changed her course to the westward, with the result that she was bearing across the schooner's course. The mate and the helmsman of the schooner both say that the tug was on their port bow, the former seeing her for some distance, and the latter not having a view of her because of the sails obscuring his vision on the port side; but he said that he saw nothing to the starboard except the lighthouse, and that, had the tug been there, he would have seen it, the night being clear and his view unobstructed.

The testimony submitted by the tug places her on a north-northwest course, close to the western land, her mate in her pilot house, her second engineer and fireman on duty, the green light of the schooner two points on her starboard bow—a situation perfectly safe; that the helm of the tug was slightly starboarded, thereby giving the schooner more room; that this situation continued until the vessels were about three-quarters of a mile apart, when the mate of the tug, noticing that the schooner was beginning to luff, put his helm more to starboard; that when the schooner was within a quarter of a mile of the tug she suddenly luffed, shut out her green light and opened her red, when the tug sounded several short whistles, and rang bells to stop engine, such order being obeyed; that the collision immediately followed, the schooner striking the tug on the starboard bow, ten feet abaft the stem, turning the tug over so as to submerge her port rail, throwing the captain out of his bunk, and the second engineer overboard, resulting in his being drowned, and both vessels being greatly injured.

The depositions of the men on duty on the schooner were duly taken; the master of that vessel, and the master, mate, cook, and fireman of the tug, as also the master of the barge Baltimore, with several other witnesses, being examined in open court at the hearing. The court below found the tug to be at fault, decreeing damages against her in favor of the several claimants. From the decree so entered this appeal was sued out.

The tug was a steam vessel, and it was her duty to keep out of the way of the schooner, a sailing vessel. The court below found against the tug, and as the evidence was conflicting the presumption in this court is against the appellant. The depositions of the men on duty on the schooner when the collision occurred were read by the court below, and the testimony of those on duty on the tug at that time was taken in open court. The decree entered below indicates that the latter, who were seen and heard, did not favorably impress the court.

It is quite plain from the testimony that the tug failed to do what under the circumstances she should have done in order to have kept

out of the way of the sailing vessel. The mate of the tug, who was steering her, on whose testimony her contention is chiefly based, there being no one else on deck at that time, does not show that she was so navigated as to avoid collision with the schooner. Instead of blowing her whistle as a warning to the schooner, he should have so maneuvered his vessel as to have kept out of the schooner's way. He saw the sails of the schooner, when she was at least two miles away, and in order to avoid her changed his course half a point to the westward. He had ample time in which to have kept out of the schooner's way, and yet beyond a slight change in her course, the whistling mentioned, and the stopping of his vessel, did nothing to prevent the accident. In fact, he tells an extremely unreasonable story, and his placing the schooner two points off the starboard bow of the tug—the vessels approaching each other green to green—is under the circumstances otherwise shown to exist, and the probabilities which in cases of this kind should not be overlooked, a situation most unlikely. If that was the relative position of the two vessels, there was no danger of collision, and it is inconceivable that the schooner should have deliberately so changed her course as to render the accident unavoidable. In this connection we quote approvingly these words from the opinion of the court below:

"It seems to me in the highest degree improbable that the schooner made such an absurd and unjustifiable change in her course as would have been necessary to bring about the collision in the way those on the tug have stated it."

We are forced to the conclusion that as the vessels approached each other the schooner was on a course south by east, and the tug's course was virtually north by west, showing her red light on the port bow of the schooner; that the schooner held her course, as it was her duty to do; that the tug made no proper effort to keep out of the way of the schooner, as she could easily have done; and that the change of her course made by the tug rendered the collision inevitable. A vessel going down the bay would be, according to the chart, at the point where the collision occurred, ordinarily on a course south by east, while the proper course of a vessel bound up would at that place be north by west. The only witness who testified regarding the position of the vessels, the course they were on, and the change they made, who was on the tug at the time of the collision, was the pilot, and he not only located the vessels in positions they were not likely to occupy, but described movements made by them which we think clearly demonstrated carelessness on the part of the tug. On the other hand, nothing improbable is presented by the situation, as it was shown to exist by those on the schooner, whose statements are to us clear and convincing concerning what occurred previous to the collision, even though as to subsequent matters they were mistaken.

The insistence of the appellant that the absence of a regular lookout on the schooner was the cause of, or that it contributed to, the collision, is in the light of the facts without merit, for it clearly appears that each vessel was well aware of the presence and movements of the other. The mate of the schooner, who was acting as lookout, seems

to have been attentive to his duties as such, observed and reported the lights—the white and the red—of the tug when that vessel was about a mile distant. Had the lookout of the tug been as vigilant, and that vessel as well navigated as was the schooner, the accident would have been averted.

We find nothing in the testimony that will justify us in reversing the conclusion reached by the court below.

Affirmed.